SPILLANE SHAEFFER
  ARONOFF BANDLOW LLP
Lincoln D. Bandlow (SBN 170449)
1880 Century Park East, Suite 1004
Los Angeles, CA 90067-2627
Telephone: (310) 229-9300
Fax: (310) 229-9380
Email: lbandlow@ssablaw.com

Attorneys for Defendant
HALLMARK CARDS, INCORPORATED

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PARIS HILTON, an individual,<br><br>        Plaintiff,<br><br>vs.<br><br>HALLMARK CARDS, a Missouri corporation; and DOES 1 through 10 inclusive,<br><br>        Defendants. | CASE NO. CV 07-05818 PA (AJWx)<br><br>**DEFENDANT HALLMARK CARDS, INCORPORATED'S NOTICE OF MOTION AND SPECIAL MOTION TO STRIKE UNDER C.C.P. § 425.16; SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Notice of Motion and Motion To Dismiss; Request for Judicial Notice; Declarations of Lincoln D. Bandlow, Marianne McDermott and Christopher Darst filed concurrently]<br><br>Date:  December 3, 2007<br>Time:  1:30 p.m.<br>Judge:  Hon. Percy Anderson |

SSAB

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on December 3, 2007, at 1:30 p.m., or as soon thereafter as counsel may be heard, in Courtroom 15 of the above-entitled Court, the Honorable Percy Anderson presiding, located at 312 N. Spring Street, Los Angeles, California 90012, Defendant Hallmark Cards, Incorporated ("Hallmark") will and hereby does move the Court for an order striking the first claim for relief in the Amended Complaint filed by Paris Hilton ("Hilton") under California's anti-SLAPP statute, Code of Civil Procedure § 425.16 ("Section 425.16").[1]

This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on September 28, 2007.

The first claim of relief in the Amended Complaint is based on Hallmark's speech in connection with issues of public interest. Accordingly, this claim falls within the scope of Section 425.16(e)(4) and, as such, the burden shifts to Hilton to establish, with competent and admissible evidence, a probability that she will prevail on that claim. C.C.P. § 425.16(b)(1). Hilton cannot satisfy her burden for the following reasons:

(1) Hallmark's speech that forms the basis of the first claim for relief is fully protected under the First and Fourteenth Amendments to the United States Constitution and under Article I, Section 2 of the California Constitution;

(2) The first claim for relief, for common law misappropriation of the right of publicity, fails for the following independent reasons:

    a. A right of publicity claim requires a commercial purpose, but Hallmark's speech referencing Hilton is expressive, not commercial;

    b. The transformative nature of Hallmark's references to Hilton precludes liability; and

---

[1] The acronym "SLAPP" stands for Strategic Lawsuit Against Public Participation.

1

c.  The references to Hilton are matters of "public interest."

The foregoing grounds are addressed in detail in the attached Memorandum of Points and Authorities.  This Motion is based on this Notice, the attached Memorandum of Points and Authorities, the concurrently-filed Notice of Motion and Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6), the Declarations of Lincoln Bandlow, Marianne McDermott and Christopher Darst, the Request For Judicial Notice, all papers, pleadings, records and files in this case, and on such other evidence and/or argument as may be presented to the Court on the hearing on this Motion.

Hallmark respectfully requests that the Court strike the first claim for relief in Hilton's Amended Complaint with prejudice and without leave to amend.

DATED:  November 2, 2007          SPILLANE SHAEFFER ARONOFF BANDLOW LLP


By: _____

          Lincoln D. Bandlow

Attorneys for Defendant
HALLMARK CARDS, INCORPORATED

SSAB

TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................1

II.    STATEMENT OF FACTS ...........................................................3

III.   HILTON'S COMMON LAW MISAPPROPRIATION CLAIM
       FALLS  WITHIN THE SCOPE OF CALIFORNIA'S ANTI-SLAPP
       STATUTE..................................................................................7

       A.     California's Anti-SLAPP Statute Applies To Pendent State Law
              Claims in Federal Question Cases..................................................8

       B.     The Anti-SLAPP Statute Broadly Protects Media And
              Entertainment Defendants Such As Hallmark..................................8

       C.     The Anti-SLAPP Statute Applies To "Any Kind Of Claim"
              Interfering With Free Speech Rights...............................................9

       D.     Hallmark's Card Falls Within The Scope Of The Anti-SLAPP
              Statute Because It Is Speech About A Matter Of Public Interest....10

IV.    HILTON CANNOT DEMONSTRATE A PROBABILITY OF
       SUCCESS  ON THE FIRST CLAIM FOR RELIEF .............................13

V.     CONCLUSION.........................................................................14

1

## TABLE OF AUTHORITIES

2    STATE CASES

3    *Blanche Hall v. Time Warner, Inc.*, 153 Cal. App. 4th 1337 (2007) ...................... 11

4    *Briggs v. Eden Council*, 19 Cal. 4th 1106 (1999); ..................................................... 9

5    *Carlisle v. Fawcett Publications, Inc.*, 201 Cal. App. 2d 733 (1962) ................... 10

6    *Church of Scientology v. Wollershem*, 42 Cal. App. 4th 628 (1996) ................. 9, 13

7    *City of Fotati v. Cashman*, 29 Cal. 4th 69 (2002) .................................................. 10

8    *Damon v. Ocean Hills Journalism Club*, 85 Cal. App. 4th 468 (2000) ............. 9, 10

9    *Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536 (1993) ............................ 13, 14

10    *Equilon Enterprises, LLC v. Consumer Cause, Inc.*, 29 Cal. 4th 53 (2002) ..... 7, 8, 9

11    *Gates v. Discovery Communications, Inc.*, 34 Cal. 4th 679 (2004) ....................... 12

12    *Gilbert v. National Enquirer, Inc.*, 43 Cal. App. 4th 1135 (1996) ........................ 10

13    *Gill v.Hearst Publishing Co.*, 40 Cal. 2d 224 (1953) ............................................. 12

14    *Guglielmi v. Spelling-Goldberg Productions*, 25 Cal. 3d 860 (1979) ................... 12

15    *Jarrow Formulas, Inc. v. LaMarche*, 31 Cal. 4th 728 (2003) ................................. 9

16    *Ingels v. Westwood One Broad. Servs. Inc.*, 129 Cal. App. 4th 1050
17       (2005) .......................................................................................................................... 9

18    *Lafayette Morehouse v. Chronicle Publ'g Co.*, 37 Cal. App. 4th 855
       (1995) .......................................................................................................................... 9

19    *Lieberman v. KCOP Television, Inc.*, 110 Cal. App. 4th 156 (2003) ...................... 9

20    *Macias v. Hartwell*, 55 Cal. App. 4th 669 (1977) .................................................. 13

21    *Polygram Records, Inc. v. Superior Court*, 170 Cal. App. 3d 543 (1985) ............ 12

22    *Reader's Digest Ass'n v. Superior Ct.*, 37 Cal.3d 244 (1984) ............................... 10

23    *Seelig v. Infinity Broadcasting Corp.*, 97 Cal. App. 4th 798 (2002) ....................... 9

24    *Sipple v. Foundation for Nat'l Progress*, 71 Cal. App. 4th 226 (1999) ................. 10

25    *United States v. Lockheed Missiles & Space Co., Inc.*, 190 F.3d 963 (9th
26       Cir. 1999) .................................................................................................................. 8

27    *Varian Med. Sys., Inc. v. Delfino*, 35 Cal. 4th 180 (2005) ....................................... 7

28

## FEDERAL CASES

*Baugh v. CBS, Inc.*, 828 F. Supp. 745, 754 (N.D. Cal. 1993) ................................. 14

*Bulletin Displays, LLC v. Regency Outdoor Advertising, Inc.*, 448
    F.Supp.2d 1172 (C.D. Cal. 2006) ........................................................ 8

*Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569 (1994) ............................... 11

*Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959
    (10th Cir. 1996) ................................................................. 11, 12

*Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 63 F.Supp.2d
    1127 (N.D. Cal. 1999) ........................................................... 8

*Hustler Magazine v. Falwell*, 485 U.S. 46 (1988) ..................................... 12

*In re Bah*, 321 B.R. 41 (9th Cir. 2005) ............................................... 8

*New.Net, Inc. v. Lavasoft*, 356 F.Supp.2d 1090 (C.D.Cal 2004) ............................. 8

*Schad v. Borough of Mt. Ephraim*, 452 U.S. 61 (1981) ................................... 12

*Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977) .................. 12

## STATUTES

C.C.P.   § 425.16 ............................................................ 7, 9, 10, 13

SSAB

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Paris Whitney Hilton is the stereotypical ubiquitous "household name" public figure. Born to riches and raised in a lavish and privileged lifestyle, she has repeatedly and successfully sought out the public spotlight. She has appeared on or in hundreds of magazines, talk shows and newspapers, starred in motion pictures and television programs and walked down countless red carpets. Indeed, in July 2006, she was quoted as saying that "every decade has an iconic blonde – like Marilyn Monroe or Princess Diana – and right now, I'm that icon." In her autobiography, *Confessions of an Heiress*, she claims she is a woman whose "name is on everyone's lips" who "has the whole world at her stiletto-clad feet" and has "a lifestyle most girls dream about." Indeed, a Google internet search of "Paris Hilton" yields over 16,100,000 hits. Hilton relishes this attention: "Sure, it's been great having so much attention. Who wouldn't want that?" Declaration of Lincoln Bandlow ("LDB") ¶ 4, Ex. C, pgs. 12-22, 29; ¶ 5, Ex. D., pgs. 112-113.

With that attention, of course, has come scrutiny, often in the form of parody or criticism. Indeed, Hilton has been described as "famous for being famous" and Americans have been chastised for paying more attention to Hilton than to other more pressing matters, such as the war in Iraq. Thus, she is the subject of numerous parodies, commentaries, editorials and discussions. It is exactly one such parody that Hilton now seeks to suppress.

Hilton has sued Hallmark Cards, Incorporated ("Hallmark") over a greeting card (the "Card") that pokes fun at Hilton and her vapid use of the phrase "that's hot." Hilton herself has written that "[p]ossibly the best thing about being an heiress is that you don't necessarily have to work. Everyone else must work, though, so it immediately sets you apart. I've never had to have a wardrobe to wear to an office, thank God. I can't imagine anything as boring as wearing some dumb, sexless

1

1    pantsuit." LDB ¶ 5, Ex. D., p. 109. Her scorn for the "regular folk" is even

2    highlighted in the Amended Complaint, where she states that working "manual, low-

3    paying jobs" and serving the public is her "private nightmare." Amended Complaint

4    ("Cmpt.") ¶¶ 6-8.

5         The Card, however, takes aim at that scorn and at Hilton's lifestyle, depicting

6    her as a waitress at a sit-down restaurant, serving a customer a plate of food and

7    warning him to be careful because it is "hot." When the patron asks "What's hot?"

8    Hilton responds, "That's hot" – obviously referring to the hot plate of food. The joke,

9    of course, is that Hilton claims to have coined the phrase "That's Hot" (Cmpt. ¶ 9)

10   which, as used by her, denotes something as trendy, sexy or desirable. In the Card,

11   however, the phrase is used literally as a warning about the temperature of a plate of

12   food, rather than as a measure of desirability (assumedly to the chagrin of the male

13   patron).

14        Hilton's effort in this lawsuit to punish Hallmark for speech that takes aim at

15   this self-described "icon" is precisely what California's Anti-SLAPP statute was

16   designed to address. Her first claim for relief for common law misappropriation of

17   right of publicity is subject to dismissal under California's anti-SLAPP statute, Code

18   of Civil Procedure § 425.16, because the speech concerns matters of public interest.

19   There is a public interest in the activities of public figures, like Hilton; there is also a

20   public interest in parody, entertainment and humor, particularly when they take aim at

21   iconic celebrities and popular culture. Indeed, her cultural influence is such, and

22   interest in her is so pervasive, that a candidate for the President of the United States

23   has even been quizzed on whether his children approve of the antics of Hilton or

24   believe that she is a poor role model. LDB ¶ 4, Ex. C, pgs. 55-59. Because Hilton's

25   right of publicity claim is subject to an anti-SLAPP motion, the burden rests with

26   Hilton to prove the probability that she will prevail on that claim. She cannot meet

27   that burden.

28

1   Hilton cannot prevail on her common law right of publicity claim for several

2   reasons.  First, a valid right of publicity claim requires the use of a name or likeness

3   for a *commercial* purpose.  The Hallmark Card, however, uses Hilton's name and

4   likeness for an expressive, parodic purpose, not for a commercial purpose.  Second,

5   Hallmark's use is transformative and therefore entitled to the full protection of the

6   United States and California Constitutions.  Finally, Hallmark's use falls under the

7   "public interest" exception to the common law right of publicity.  Accordingly,

8   Hilton's first claim for relief should be stricken under the anti-SLAPP statute.

9   ## II.   STATEMENT OF FACTS

10   Hilton is "an American celebutante, businesswoman, singer, model, actress, and

11   television personality.  She is the daughter of real estate magnate Richard Hilton and

12   great-granddaughter of Conrad Hilton, founder of the Hilton chain of hotels.  LDB ¶ 4,

13   Ex. C, p. 14.  Indeed, Hilton contends that "[e]verybody knows the story of my family;

14   it's been written about so many times."  LDB ¶ 5, p. 111.  She admits that she is a

15   cultural icon, often referring to herself as "Paris Barbie."  LDB ¶ 5, Ex. D, p. 106.  She

16   draws attention wherever she goes, as she admits, "[w]hen I go out, I'm going to be

17   photographed."  LDB ¶ 5, p. 108.  Her image or stories about her appear in gossip

18   magazine on the newsstands on a weekly basis.  Indeed, the Associated Press

19   conducted an "experiment" in February 2007 to see if it could refrain from reporting

20   on Hilton for a whole week.  LDB ¶ 4, Ex. C, pgs. 18-19.

21   The massive amount of attention paid to Hilton is, itself, the subject of

22   tremendous attention and scrutiny.  A December 2006 Philadelphia Inquirer article

23   stated that although "fully half the reading public and 90 percent of gossip peddlers

24   say they never want to see or hear the name Paris Hilton again" the Google internet

25   search engine reported that "the cultural icon" Hilton was the most searched news

26   subject of the year, beating such subjects as "cancer", "Hurricane Katrina" and

27   "autism."  LDB ¶ 4, Ex. C, p. 35.  The Lycos internet search engine reported that the

28   number one searched term in 2005 was "Paris Hilton."  LDB ¶ 4, p. 26.

SSAB

3

1       Parodies, cartoons, commentaries and editorials about Hilton abound.  Editorial

2  cartoonists have commented on:  Hilton's jail time for violating terms of her probation

3  after she was convicted of driving with a suspended license (and the frenzy over her

4  early release from, and then return to, jail); America's fascination with celebrity

5  including Hilton; the unequal treatment of "celebrity" defendants such as Hilton; the

6  juxtaposition of Hilton's and Scooter Libby's treatment by the judicial system;

7  whether coverage of Hilton's feud with Nichole Richie trumped coverage of the war in

8  Iraq; Hilton's racy (some say "raunchy") commercial for Carl's Jr.; Hilton's inability

9  to comprehend the life of the "common man" as portrayed on the show "The Simple

10  Life"; and other various matters.  LDB ¶ 4, Ex. C. pgs. 60-101.  Indeed, some

11  editorialists have used mock greeting cards as their method of commentary on Hilton.  LDB

12  ¶ 4, Ex. C, p. 53.  Parodies of Hilton are everywhere.  For example: the animated series

13  *Bratz* included a parody character named "London Milton" that was an obvious parody

14  of Hilton; shortly after Hilton was incarcerated in June 2007, a music video spoofing

15  her jail sentence was one of the most-watched videos on the YouTube service; the

16  2007 film *Epic Movie* spoofs Hilton by showing a Hilton look-alike walking out of a

17  clothes store and uttering "I'm so hot!" only to be crushed to death by one of the film's

18  protagonists, as a dog like Hilton's pet dog "Tinkerbell" wanders away; and, perhaps

19  not in the best taste, the television program *South Park* featured an episode titled

20  "Stupid Spoiled Whore Video Playset" that was about Hilton.  LDB ¶ 4, Ex. C, pgs.

21  19, 38.

22       Hilton's name – and her image as being a privileged, vapid celebrity – have

23  entered the political vernacular as well.  For example, in an article about testimony

24  provided by General David Petraeus, the General in charge of military operations in

25  Iraq, the author criticized Petraeus as being the "Paris Hilton of Generals."  LDB ¶ 4,

26  Ex. C, p. 40.  In an April 2005 *Wall Street Journal* article discussing Congress'

27  proposed repeal of the estate tax, the author titled it "Paris Hiltonomics" and discussed

28

SSAB

1    how opponents of the bill were calling it the "Paris Hilton Benefit Act."  LDB ¶ 4, Ex.

2    C, pgs. 23-24.

3         In addition, Hilton's use of the phrase "That's Hot" is also the subject of

4    numerous parodies.  For example, the National Organization for Women offers a t-

5    shirt that has a very simple message, one that is directed in part at Hilton's status as a

6    role model for young girls:  "Feminism – That's Hot."  LDB ¶ 4, pgs. 47-49.

7    Moreover, in an article about Hilton's purported disinheritance by her grandfather,

8    William Barron Hilton, the author scoffingly titles the article: "Paris Loses Inheritance,

9    That's Hot!"  LDB ¶ 4, Ex. C, p. 39.  Similarly, an article about Hilton being sentenced

10   to jail time for violating the terms of her probation, along with President Bush being

11   held accountable for the problems associated with the war in Iraq, is titled "Paris, the

12   President, and Accountability: That's Hot!"  LDB ¶ 4, p. 37.  Finally, one of the

13   countless editorial cartoons about Hilton's incarceration shows Hilton pointing to her

14   striped prison garb and saying "That's hot, but do you, like, have it in pink?"  LDB

15   ¶ 4, Ex. C., p. 99.

16        Hallmark is a Missouri company that creates and manufactures greeting cards,

17   including the Card.  Cmpt. ¶¶ 2, 10.  Greeting cards have a long history and have, from

18   the outset, been an important (and well recognized) means of communication and

19   expression, fulfilling important social and psychological needs.  For example, during

20   WWII, millions of greeting cards were provided through the Red Cross to wounded

21   servicemen and were used to promote defense stamps and war bonds.  Declaration of

22   Marianne McDermott ("MM") ¶¶ 3-6.

23        The sending of greeting cards is one of the most accepted U.S. customs, with

24   seven billion greeting cards being given a year.  Greeting cards help reach across

25   generational, gender and cultural communication gaps.  Cards speak to many different

26   occasions, sentiments, ages, groups, ethnicities, and special interest groups and can

27   help people express what they are unable to say face-to-face or what they cannot find

28

1   the words to say.  Surveys show that people recognize the unique benefits of greeting

2   cards.  MM Decl. ¶¶ 7-11.

3        In addition to helping people communicate with others, greeting cards are a

4   substantial avenue of expression for the writers and artists who create greeting cards.

5   A greeting card marries art and editorial – a card's message is communicated through

6   both the design and the sentiment or expression contained in the card.  The

7   composition of a greeting card tests a writer's ability to communicate and connect with

8   a reader on an emotional and intellectual level.  Thus, the writer's words are the bridge

9   which other people use to express happiness, humor, commentary, sympathy, pride,

10  admiration, comfort, elation, empathy, sadness or even silliness.  MM Decl. ¶ 12.[2]

11       For many years, greeting cards have also served as a medium for social

12  commentary, humor, parody, satire and criticism.  Greeting cards have addressed an

13  wide array of topics that have been of timely public interest.  These topics have

14  included:  the Depression; WWII; Prohibition; the economy; women's suffrage and

15  liberation; Vietnam; the radio; the jukebox; the computer; hula hoops; the atom bomb;

16  mini skirts; TV quiz shows; the fireside chat; Sputnik; beatniks; Charles Lindbergh;

17  Mussolini; rationing; hippies; hillbillies; Valley Girls; dieting and other trends; politics

18  and politicians' foibles; computers; fashion facts; and television and motion picture

19  celebrities.  MM ¶ 16; Declaration of Christopher Darst ("CD") ¶¶ 2-5, Exs. 2-3.

20

21  _____

22  [2] Indeed, the communication experience embodied in a greeting card is enhanced beyond
    traditional writing genres.  In most writing, the writer writes and the reader reads – forming a

23  two-person relationship.  The writer is the active participant, the reader is passive.  Greeting
    cards, however, involve a three-person relationship.  The writer writes the sentiment for the

24  greeting card.  When the sentiment is published in a greeting card and someone chooses the
    card, the writer's words become the sender's words.  The person who selected the card may

25  add other messages or sentiments as well before it is sent.  The greeting card writer's words

26  thus speak *to* the person who selected the card as words that person wants to say and *from*
    that same person to someone else when the card is sent.  The recipient of the card is involved

27  in the conversational quality of the card, receiving the words as not only an expression by the
    writer of the card, but a communication by the sender of the card.  MM ¶ 13.

28

1    The Card at issue is just one such card.  The Card shows an oversized

2    photograph of Hilton's head "superimposed over a cartoon of a waitress serving food

3    to a patron, along with the dialogue: 'Don't touch that, it's hot.' 'What's hot?' 'That's

4    hot.'"  Cmpt. ¶ 10.  The inside of the Card says "Have a smokin' hot birthday."  CD

5    ¶ 3, Ex. 1.  Hallmark's use of Hilton's image – placing an oversized photograph of

6    Hilton's face – over a cartoon body, injecting her into an absurd situation, and creating

7    a fictional dialogue to accompany the visual art – clearly parodies Hilton.  The Card

8    depicts Hilton as a waitress (complete with standard issue waitress apron, nametag and

9    oven mitt), performing a service job which Hilton **admits in her Amended**

10   **Complaint** is her own "private nightmare."  Cmpt. ¶¶ 7-8.  Her efforts to suppress this

11   parody through a claim for misappropriation of right of publicity cannot withstand a

12   motion to strike under the Anti-SLAPP statute.[3]

13   **III.   HILTON'S COMMON LAW MISAPPROPRIATION CLAIM FALLS**

14   **WITHIN THE SCOPE OF CALIFORNIA'S ANTI-SLAPP STATUTE**

15       California's anti-SLAPP statute, C.C.P. § 425.16 ("Section 425.16" or the "anti-

16   SLAPP statute") creates a two-step process for determining whether an action should

17   be stricken as a SLAPP.  *Varian Med. Sys., Inc. v. Delfino*, 35 Cal. 4th 180, 192

18   (2005).  First, the court decides "whether the defendant has made a threshold showing

19   that . . . the act or acts of which the plaintiff complains were taken 'in furtherance of

20   the [defendant]'s right of petition or free speech . . . in connection with a public

21   issue.'"  *Equilon Enters. V. Consumer Cause, Inc.*, 29 Cal. 4th 53, 67 (2002); C.C.P.

22   § 425.16(e)(4).  Here, Hilton's first claim for relief – misappropriation of right of

23   publicity – is based on Hallmark's speech in connection with issues of public interest.

24   Therefore, the first claim for relief falls within the ambit of the anti-SLAPP statute.

25   Second, if the statute applies, the burden shifts to the plaintiff to demonstrate a

26

27   _____

     [3] Nor can her other claims for Lanham Act violation and trademark infringement withstand

28   the concurrently-filed Motion to Dismiss.

1   probability of success on its claims, and if this burden cannot be satisfied, then the
2   claims must be stricken. *Equilon Enters.*, 29 Cal. 4th at 67; C.C.P. § 425.16(b)(1).
3   Hilton cannot satisfy that burden here, so her claim should be stricken.

4   **A.   California's Anti-SLAPP Statute Applies To Pendent State Law**
5   **Claims in Federal Question Cases.**

6       Although the anti-SLAPP statute is found in the California Code of Civil
7   Procedure, a defendant may file an anti-SLAPP statute motion in a federal lawsuit.  In
8   *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 63 F.Supp.2d 1127, 1130
9   (N.D. Cal. 1999), the court held that the anti-SLAPP statute "may be applied to state
10  law claims which . . . are asserted pendent to federal question claims."  The Ninth
11  Circuit "agree[s] with the *Globetrotter* court that application of the anti-SLAPP statute
12  to pendent state law claims is appropriate."  *In re Bah*, 321 B.R. 41, 46 (9th Cir. 2005).
13  Other courts have reached the same conclusion.  *See e.g. Bulletin Display\s, LLC v.*
14  *Regency Outdoor Advertising, Inc.*, 448 F.Supp.2d 1172, 1182 (C.D. Cal. 2006) (anti-
15  SLAPP statute applies to pendent state statutory and common law claims in a federal
16  question case); *New.Net, Inc. v. Lavasoft*, 356 F.Supp.2d 1090, 1099-1100 (C.D.Cal
17  2004) ("[t]his circuit has addressed the applicability of the anti-SLAPP statute in
18  federal question cases in *United States v. Lockheed Missiles & Space Co., Inc.*, 190
19  F.3d 963, 970-73 (9th Cir. 1999), in which the Court concluded that subsections (b)
20  and (c) of the anti-SLAPP statute may be applied to pendent state law claims").

21      Hilton's first claim for common law misappropriation of right of publicity is a
22  pendent state law claim.  As such, that claim is subject to California's anti-SLAPP
23  statute.

24  **B.   The Anti-SLAPP Statute Broadly Protects Media And Entertainment**
25  **Defendants Such As Hallmark**

26      The anti-SLAPP statute was enacted to encourage continued participation in
27  matters of public significance by targeting "lawsuits brought primarily to chill the
28  valid exercise of the constitutional rights of freedom of speech." *Equilon Enterprises,*

8

1   *LLC v. Consumer Cause, Inc.*, 29 Cal. 4th 53, 59-60 n.3 (2002) (quoting C.C.P. §

2   425.16(a)).  By its own language, the anti-SLAPP statute came into existence due to "a

3   disturbing increase in lawsuits brought primarily to chill the valid exercise of the

4   constitutional right of freedom of speech[.]"  C.C.P. 425.16(a).  In 1997, the

5   Legislature amended Section 425.16(a) of the anti-SLAPP statute to ensure that it

6   "shall be construed broadly."  The California Supreme Court has stressed that "the

7   broad construction expressly called for in [Section 425.16(a)] is desirable from the

8   standpoint of judicial efficiency," and has cautioned "that [a narrow construction]

9   would serve Californians poorly."  *Briggs v. Eden Council*, 19 Cal. 4th 1106, 11231-

10  22, 1125 (1999); *see also Jarrow Formulas, Inc. v. LaMarche*, 31 Cal. 4th 728, 735-36

11  (2003).

12          Consistent with the broad construction of the anti-SLAPP statute, Section

13  425.16 is routinely applied to protect media and entertainment defendants.  Thus, the

14  anti-SLAPP statute has been held to apply to claims against:  newspapers (*Lafayette*

15  *Morehouse v. Chronicle Publ'g Co.*, 37 Cal. App. 4th 855, 863-64 (1995); community

16  newsletters (*Damon v. Ocean Hills Journalism Club*, 85 Cal. App. 4th 468, 479

17  (2000)); television stations (*Lieberman v. KCOP Television, Inc.*, 110 Cal. App. 4th

18  156, 165 (2003)); and talk radio shows (*Seelig v. Infinity Broadcasting Corp.*, 97 Cal.

19  App. 4th 798, 807-08 (2002) and *Ingels v. Westwood One Broad. Servs. Inc.*, 129 Cal.

20  App. 4th 1050, 1055-56 (2005)).

21      **C.      The Anti-SLAPP Statute Applies To "Any Kind Of Claim"**

22              **Interfering With Free Speech Rights**

23          The anti-SLAPP statute contains "no . . . limiting language" that would restrict

24  its protection to certain claims.  *Church of Scientology v. Wollershem*, 42 Cal. App. 4th

25  628, 642 (1996).  "[T]he Legislature did not limit application of the provision[,] . . .

26  recognizing that all kinds of claims could achieve the objective of a SLAPP suit – to

27  interfere with and burden the defendant's exercise of his or her rights."  *Church of*

28  *Scientology*, 42 Cal. App. 4th at 652.  "[T]he critical point is whether the plaintiff's

1  cause of action itself was based on an act in furtherance of the defendant's right of

2  petition or free speech.'" *City of Fotati v. Cashman*, 29 Cal. 4th 69, 78 (2002). It is

3  just such speech that is the basis for Hilton's first claim.

**D.    Hallmark's Card Falls Within The Scope Of The Anti-SLAPP**

5          **Statute Because It Is Speech About A Matter Of Public Interest**

6          Section 425.16(e)(4) encompasses any claim that arises from, or is based on, a

7  defendant's exercise of speech rights "in connection with a public issue or an issue of

8  public interest." C.C.P. § 425.16(e)(4). Pursuant to the express directives of the

9  legislature and California Supreme Court, "[t]he definition of 'public interest' within

10 the meaning of [Section 425.16] has been broadly construed to include not only

11 governmental matter, but also private conduct that impacts a broad segment of

12 society." *Damon v. Ocean Hills Journalism Club*, 85 Cal. App. 4th 468, 479 (2000).

13         Hilton's first claim for relief is based on Hallmark's speech – i.e., the greeting

14 Card which references Hilton and her catchphrase "that's hot." *See* Cmpt. ¶¶ 8, 10 and

15 15. Under the broad construction of Section 425.16(e)(4), it is clear that Hallmark's

16 speech was made in connection with an issue of public interest.

17         First, "there is a public interest which attaches to people who by their

18 accomplishments, mode of living, professional standing or calling, create a legitimate

19 and widespread attention to their activities." *Carlisle v. Fawcett Publications, Inc.*,

20 201 Cal. App. 2d 733, 746 (1962). As a consequence, public figures "must tolerate

21 some criticism as the price of living in a free society," *Gilbert v. National Enquirer,*

22 *Inc.*, 43 Cal. App. 4th 1135, 1147 (1996), and they are "less deserving of protection

23 than private persons," in part because they "ordinarily enjoy considerably greater

24 access than private individuals to the media and other channels of communication,"

25 *Reader's Digest Ass'n v. Superior Ct.*, 37 Cal.3d 244, 253 (1984). The activities of

26 public figures, such as Hilton, are matters of public interest within the context of the

27 anti-SLAPP statute. *See, e.g., Sipple v. Foundation for Nat'l Progress*, 71 Cal. App.

28 4th 226, 239-240 (1999) (statement about prominent political consultant fell within the

SSAB

1  protection of Section 425.16); *Blanche Hall v. Time Warner, Inc.*, 153 Cal. App. 4th

2  1337 (2007) (lawsuit over statements relating to the distribution of Marlon Brando's

3  assets after his death was proper subject of Anti-SLAPP motion due to "public's

4  fascination with Brando and widespread public interest in his personal life [which]

5  made Brando's decisions concerning the distribution of his assets a public issue or an

6  issue of public interest").

7      Hilton indisputably attracts vast amounts of attention and publicity – much of it

8  as a result of her own efforts and actions.  Seemingly every aspect of her life is fodder

9  for the press and for water cooler conversations – from her television appearances, to

10  the lavish lifestyle she leads, to her party hopping, to her romances and sexual

11  escapades (whether videotaped or not), to her high fashion clothing, to her idioms, to

12  her incarceration (and controversial early release) and to various other legal issues –

13  including even the filing of this lawsuit.  LDB ¶ 4, Ex. C, pgs. 12-103.  Indeed, Hilton

14  recently announced (and then postponed) a trip to Rwanda to draw attention to the

15  region from her mere presence.  LDB ¶ 4, Ex. C, p. 46.  This certainly places her

16  squarely within the category of "public interest" for the purposes of the anti-SLAPP

17  statute.

18      Second, there is a public interest in parodies, including Hallmark's parody of

19  Hilton and her use of the phrase "That's Hot."[4]  "'Parodies and caricatures,' noted

20  Aldus Huxley, 'are the most penetrating of criticisms.'"  *Cardtoons, L.C. v. Major*

21  *League Baseball Players Ass'n*, 95 F.3d 959, 972 (10th Cir. 1996).  A parody "can

22  provide social benefit, by shedding light on an earlier work, and, in the process,

23  creating a new one."  *Campbell*, 510 U.S. at 579.  Moreover, parodies of celebrities are

24

25  _____

26  [4] A parody is a "literary of artistic work that imitates the characteristic style of an author or a work for comic effect or ridicule,' or as a 'composition in prose or verse in which the characteristic turns of thought and phrase or class of authors are imitated in such a way as to make them appear ridiculous.'"  *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 580 (1994) (footnotes omitted).

27

28

SSAB

1  "an especially valuable means of expression." *Cardtoons*, 95 F.3d at 972.  "Because

2  celebrities are an important part of our public vocabulary, a parody of a celebrity …

3  exposes the weakness of the idea or value that the celebrity symbolizes in society." *Id.*

4  This is because celebrities are "common points of reference for millions of individuals

5  who may never interact with one another, but who share by virtue of their participation

6  in a mediated culture, a common experience and a collective memory." *Id.*

7  　　　In the same vein, parodies aim to entertain us through humor as well as

8  enlighten us.  Humor "is an important form of social commentary." *Polygram*

9  *Records, Inc. v. Superior Court*, 170 Cal. App. 3d 543, 553 (1985)  Like other forms of

10  entertainment, it is constitutionally protected speech.[5]  Entertainment, criticism and

11  humor concerning public figures is afforded First Amendment protection regardless of

12  motive and taste.  *See Hustler Magazine v. Falwell*, 485 U.S. 46, 53 (1988).

13  Regardless of the medium of the greeting card, or whether some might interpret the

14  parody different from others, its purpose is to make social commentary about Hilton in

15  and amusing and entertaining way.

16  　　　Third, greeting cards have a long history of being an important and well

17  recognized means of communication and expression.  They help people express what

18  they are unable to say face-to-face or what they cannot find the words to say.

19  Moreover, greeting cards serve as a medium for social commentary, humor, parody,

20

---

21  [5] *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61 (1981). ("[e]ntertainment, as well as

22  political and ideological speech, is protected; motion pictures, programs broadcast by radio
and televisions . . . fall within the First Amendment guarantee'); *Zacchini v. Scripps-Howard*

23  *Broadcasting Co.*, 433 U.S. 562, 578 (1977) )"[t]here is no doubt that entertainment, as well
as news, enjoys First Amendment protection"); *Gates v. Discovery Communications, Inc.*, 34

24  Cal. 4th 679, 695 (2004) ("the constitutional guarantees of freedom of expression apply with

25  equal force to the publication whether it be a news report or an entertainment feature");
*Guglielmi v. Spelling-Goldberg Productions*, 25 Cal. 3d 860, 865-67 (1979) (Bird, C.J.,

26  concurring) (entertainment on television is included in the free speech guarantees of the First
Amendment and Article 1, Section 2 of California Constitution); *Gill v.Hearst Publishing*

27  *Co.*, 40 Cal. 2d 224, 229 (1953) (holding that the constitutional protection for publications

28  applies "whether it be a news report or an entertainment feature").

12

1  satire and criticism and have addressed an array of topics that have been of timely
2  public interest, such as the commentary on Hilton made by the Card.

3      Fourth, Hilton and her use of the phrase "That's Hot" qualifies as a matter of
4  public interest.  Public interest attaches to "popular culture' and "real life events which
5  have caught the popular imagination."  *Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th
6  536, 542-43 (1993).  Hilton is an icon of popular culture.  She has been cited as the
7  premiere example of someone who is "famous for being famous."  Even Hilton's
8  purported catchphrase qualifies as a matter of public interest.  *See Church of*
9  *Scientology*, 42 Cal. App. 4th at 651 (public interest can be "evidenced by media
10 coverage").  Accordingly, the "first prong" of the Anti-SLAPP statute is met here.

## IV.   HILTON CANNOT DEMONSTRATE A PROBABILITY OF SUCCESS ON THE FIRST CLAIM FOR RELIEF

13     Because Hallmark has satisfied the first prong of the anti-SLAPP statute's test
14 by demonstrating that Hallmark's Card was speech in connection with a matter of
15 public interest under CCP § 425.16(e)(4), the burden now shifts to Hilton to
16 demonstrate a probability that she will prevail on her first claim for relief.  *Equilon*
17 *Enters.*, 29 Cal. 4th at 67; C.C.P. § 425.16.  Hilton must present "competent and
18 admissible evidence' showing that she "probably" will prevail on those claims.
19 *Macias v. Hartwell*, 55 Cal. App. 4th 669, 675 (1977).  As set forth in the
20 concurrently-filed Motion to Dismiss,[6] Hilton simply cannot satisfy this burden, and
21 therefore her first claim for relief must be stricken.

22     First, the Card is entitled to the full protection afforded by the First Amendment
23 to the United States and Article I, Section 2 of the California Constitution.  Hallmark's
24 Card is easily recognized as protected expression.  Its characterization of Hilton in a
25 fanciful setting is not only entertainment and parody, but also social commentary and
26 criticism of Hilton's lifestyle and belief system.

27 _____

28 [6] The Motion to Dismiss is incorporated herein by reference as though fully set forth.

SSAB

1     Second, the transformative nature of the Card precludes liability for Hilton's

2 right of publicity claim.  Hallmark's use of Hilton's image – placing an oversized

3 photograph of Hilton's face over a cartoon body, injecting her into an absurd situation,

4 and creating a fictional dialogue to accompany the visual art – is undoubtedly

5 transformative, which acts as a complete bar to Hilton's right of publicity claim.

6     Third, the claim is barred by the public interest defense, which protects those

7 matters that "the public is interested in and constitutionally entitled to know about,"

8 such as "'things, people and events that affect it.'"  *Baugh v. CBS, Inc.*, 828 F. Supp.

9 745, 754 (N.D. Cal. 1993) (*quoting Dora v. Frontline Video, Inc.,* 15 Cal. App. 4th

10 536, 546 (1993)).  Hilton indisputably attracts vast amounts of attention and publicity

11 – much of it as a result of her own efforts and actions.  Parodies and commentaries

12 about her certainly qualify as matters of "public interest" or "public affairs" under the

13 broad definitions of those terms.  The protection for speech on such topics is

14 "complete" and bars Hilton's right of publicity claim.

15 **V.**    **CONCLUSION**

16     In her autobiography, Hilton notes all of the parodies and commentaries about

17 her and declares that "[e]verybody can have fun with my image because *I* like to have

18 fun with it too."  LDB ¶ 5, p. 156.  Indeed, in one of her instructions on "how to be an

19 heiress" she stresses that one should "never take yourself, or rules, too seriously."

20 LDB ¶ 5, p. 158.  With the filing of this lawsuit, it is clear that Hilton is not following

21 her own advice.

22     Unfortunately for Hilton, there are a couple of "rules" that must be taken

23 seriously and which defeat her right of publicity claim:  (1) speech such as that

24 contained in the Card is wholly protected under the First Amendment to the United

25 States Constitution and under the California Constitution; and (2) claims such as

26 Hilton's in this lawsuit are properly subject to being stricken under California's Anti-

27 SLAPP statute.  For the reasons set forth above and in the concurrently-filed Motion

28 To Dismiss, Hallmark respectfully requests that the Court grant the Special Motion to

SSAB

1  Strike Under C.C.P. § 425.16 and strike Hilton's first claim for common law

2  misappropriation of right of publicity.[7]

3

4  DATED:  November 2, 2007          SPILLANE SHAEFFER ARONOFF BANDLOW LLP

5

6

7  By: _____

8                    Lincoln D. Bandlow

9  Attorneys for Defendant
   HALLMARK CARDS, INCORPORATED

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

---

27  [7] Moreover, under C.C.P. § 425.16(c), Hallmark will be entitled to recover its attorney's fees
    and costs upon prevailing on this Motion and Hallmark will seek such amounts in a

28  separately filed motion with the Court.

**PROOF OF ELECTRONIC SERVICE**

**STATE OF CALIFORNIA, County of Los Angeles:**

 I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to this action. My business address is 1880 Century Park East, Suite 1004, Los Angeles, California 90067.

 On **November 2, 2007**, I served the foregoing document(s) described as **DEFENDANT HALLMARK CARDS, INCORPORATED'S NOTICE OF MOTION AND SPECIAL MOTION TO STRIKE UNDER C.C.P. § 425.16; SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES** on the interested parties in this action:

| | |
|---|---|
| Brent H. Blakely | Robert Tucker, Esq. |
| Blakely Law Group | Tucker & Latifi LLP |
| 915 N. Citrus Avenue | 160 E. 84th St. |
| Hollywood, CA 90038-2401 | New York, NY 10028 |

☒ **By ELECTRONIC TRANSMISSION:** by causing a true copy thereof to be sent via electronic transmission to the attorney(s) of record to the email addresses so indicated and that the transmission was reported as completed and without error.

☒ **By MAIL:** by placing true and correct copy(ies) thereof in an envelope addressed to the attorney(s) of record, addressed as stated above.

☐ **By FAX:** by causing a true copy thereof to be sent via facsimile to the attorney(s) of record at the telecopier number(s) so indicated above and that the transmission was reported as completed and without error.

☐ **By FEDERAL EXPRESS:** by causing same to be delivered via Federal Express to the addressee(s).

☐ **(State)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☒ **(Federal)** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

 Executed on **November 2, 2007**, Los Angeles, California.

_____
Marina Pascu