Brent H. Blakely (SBN 157292)
BLAKELY LAW GROUP
915 North Citrus Avenue
Hollywood, California  90038-2401
Telephone: (323) 464-7400
Facsimile:  (323) 464-7410

*Attorneys for Plaintiff Paris Hilton*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

PARIS HILTON,

               Plaintiff,

   vs.

HALLMARK CARDS,

               Defendants.

 )
 )
 )
 )
 )
 )
 )
 )
 )
 )
 )
 )
 )
 )

**CASE NO. 07-5818 PA (AJWx)**

***PLAINTIFF PARIS HILTON'S OPPOSITION TO DEFENDANT HALLMARK CARDS' MOTION TO DISMISS***

Hearing
Date:     December 17, 2007
Time:    1:30 p.m.
Dept:    15

1  **I.      INTRODUCTION**

2           Hallmark's attempt to masquerade its misappropriation of Plaintiff Paris

3  Hilton's name and likeness as a "parody" and/or "newsworthy" fails for the simple

4  reason that Hallmark's use of her identity was primarily, if not solely, for a

5  commercial purpose.  Although the First Amendment allows wide latitude to

6  engage in speech and commentary,  it does not allow the non-consensual

7  commercial exploitation of a celebrity's name and likeness.  [Zacchini v. Scripps-

8  Howard Broadcasting Co., 433 U.S. 562 (1977)]  As the Ninth Circuit held in

9  Downing v. Abercrombie & Fitch, 265 F.3d 994 (9th Cir. 2001),  where the primary

10 purpose of the use in question is commercial,  it will not be entitled to First

11 Amendment Protection.

12          Hallmark is in the business of selling greeting cards, and everything

13 Hallmark does is engineered towards that singular purpose.  Any purported

14 humorous/parodic aspect of Hallmark's card is subservient to the commercial

15 element - the sale of a product.  Quite simply, Hallmark is selling greeting cards and

16 used Plaintiff's image to aid in that singular commercial endeavor.  As the Supreme

17 Court and Ninth Circuit have repeatedly held, such unauthorized exploitation hardly

18 implicates the First Amendment.

19          Likewise, there is nothing "transformative" about Hallmark's greeting card.

20 Hallmark has done nothing more than take a literal depiction of Ms. Hilton and

21 place it in the same context as a role she played in the popular television show The

22 Simple Life.  Indeed, the card is a rip-off of the episode Sonic Burger Shenanigans

23 where Ms. Hilton works as a waitress serving customers.  As the California

24 Supreme Court noted in Comedy III Productions v. Sarderup (2001) 25 Cal. 4th 387,

25 404, when, as here, "artistic expression takes the form of a literal depiction of a

26 celebrity for commercial gain, directly trespassing on the right of publicity without

27 adding significant expression beyond that trespass, the state law interest in

28 / / /

**1.**

1 protecting the fruits of artistic labor outweighs the expressive interests of the

2 imitative artist."

3      In its Motion to Dismiss Hallmark takes the position that whenever an

4 infringer claims that its' misappropriation of a celebrity's identity was done in

5 connection with a "parody" or is a matter or "public interest," its conduct is

6 somehow automatically immunized.  This misconceived argument is disabused by

7 Zacchini and every other case which discusses the weighing process that must be

8 utilized by the trier of fact when the right to publicity comes into conflict with the

9 First Amendment.  As these courts have held, whether a defendant's use of a

10 celebrity's likeness is primarily related to a commercial purpose,  and therefore not

11 protected by the First Amendment,  is a matter of fact that must be left to the jury to

12 decide.   Indeed, the attorneys now representing Hallmark in this case had the very

13 same "automatic immunization" argument rejected by the Ninth Circuit in

14 Downing, when they represented clothing retailer Abercrombie & Fitch.

15      Hallmark has ignored this controlling legal precedent (Downing is not even

16 mentioned in their papers) and instead chosen to take the low road by personally

17 attacking Plaintiff.  This is clearly a tactic by Hallmark to shift attention away from

18 its own unlawful conduct.  Contrary to what Hallmark would like this Court to

19 believe, this case is not about Paris Hilton or an attempt at censorship.  It is about a

20 multi-billion dollar company's calculated theft of the economic value generated by

21 a celebrity's fame for its own profit.  No amount of ducking and weaving on the

22 part of Hallmark will change the fact that its' unauthorized use of Plaintiff's

23 identity in connection with the sale of its' merchandise is a violation of Plaintiff's

24 right of publicity and is not protected by the First Amendment.

25 **II.**    **FACTS**

26      Plaintiff Hilton is an American businesswoman, model, actress and recording

27 artist.  Some of her most recognizable screen work has been alongside friend Nicole

28 Richie in The Simple Life. (FAC, ¶ 6)

**2.**

1    The Simple Life is a television series broadcast on Fox since 2003.  The
2    comedic show depicts two wealthy young socialites (Hilton and Richie) as they
3    struggle to do manual, low-paying jobs such as cleaning rooms, doing farm work,
4    serving meals in fast-food restaurants and working as camp counselors.  (FAC, ¶ 7)

5    The idea for The Simple Life was generated in Fox's comedy department.
6    Brad Johnson, senior VP of comedy development, has said that The Simple Life
7    was born out of a challenge from Fox Television Entertainment Group Chairman
8    Sandy Grushow and News Corp. President and Chief Operating Officer Peter
9    Chernin to find another way to do comedies outside of the traditional sitcom format.
10   The Simple Life was inspired by Green Acres, a sitcom about a New York society
11   couple who moved to a farm. Cameras would observe as the former socialites,
12   deprived of access to their bank accounts and Beemers, attempt to get a job, buy
13   groceries and fit in with average Americans.  At the same time the comedy
14   department was developing the idea, Paris Hilton was meeting with the studio's
15   casting department.  The two departments talked and realized they had their show:
16   Send Hilton and Richie to live and work on a farm. (Blakely Decl., Exh. 1)

17   In the first season, Hilton and Richie moved in with the Leding family in
18   Altus, Arkansas for a month.  What was supposed to be an experiment in learning
19   how to adapt to doing chores and getting their hands dirty turned out to be a failure.
20   In the process they would ruin a dairy farmer's milk supply, wreak havoc at a local
21   Sonic Drive-In and take advantage of an employer's credit card, ultimately getting
22   fired from every job they took up.

23   The show started airing on Fox December 2, 2003, to well received ratings.
24   The premiere episode drew 13 million viewers, increasing Fox's Adults 18-49 rating
25   a phenomenal 79%.  The second episode drew 13.3 million viewers, an increase of
26   200,000 viewers over its premiere.  During the airing of the series, Fox added two
27   extra episodes and a reunion special, which continued to draw ratings. The DVD of
28   this season was released in U.S. on January 20, 2004.  Some international releases

**3.**

1   included the bonus episode and the reunion episode.[1]  (Blakely Decl.,  Exh. 2)

2   In the December 9, 2003 episode, Sonic Burger Shenanigans, Hilton and Richie

3   take a job at a fast-food joint, only to find that serving the public is their private

4   nightmare.  Showing up 45 minutes late, the girls tasks included cooking food,

5   serving customers and taking out trash. (FAC, ¶8; Blakely Decl., Exh. 3)

6       During the filming of the Simple Life, Ms. Hilton coined the phrase "That's

7   Hot," which she has since registered on the Principal Register of the United States

8   Patent & Trademark Office as Registration No. 3209488, for International Class 25.

9   (FAC, ¶9)

10      Defendant Hallmark, a privately owned American company based in Kansas

11  City, Missouri, is the largest manufacturer of greeting cards in the United States.

12  Approximately 50% of greeting cards sent in the United States every year are

13  manufactured by Hallmark.  The company's cards are sold under various brand

14  names and can be found in more than 43,000 US retail stores.  Hallmark has

15  approximately 16,000 employees and its revenues in 2006 were $4.1 billion.

16  Hallmark's Chairman, Donald J. Hall, who along with his sisters inherited and now

17  own 65% of the company, is one of the wealthiest persons in the world, with a net

18  ///

_____

20      [1]The Simple Life has received and/or was nominated for the following
21  awards:
22      •   2004, won ASCAP Award for Top TV Series.
        •   2004, won BMI TV Music Award
23      •   2004, nominated for Teen Choice Awards for Choice Reality/Variety
24          TV Star - Female Paris Hilton and Choice TV Show - Reality/Variety.
        •   2005, nominated for Teen Choice Award, Choice TV Show: Reality
25          and for 'The Simple Life: Interns'.
26      •   2006, nominated in the Teen Choice Awards for TV - Choice Reality
27          Star (Female) - Paris Hilton.
        •   2007, nominated in the Teen Choice Awards for Choice TV: Female
28          Reality/Variety Star - Paris Hilton.

**4.**

1    worth of $1.9 billion.  As Forbes Magazine stated, the Hall family has "turned fuzzy
2    feelings into hard cash."  (Blakely Decl., Exh. 4)
3          In or around 2007 Hallmark manufactured, published, released and
4    distributed greeting cards wherein an actual photograph of Ms. Hilton's face is
5    superimposed over a cartoon of a waitress serving food to a patron, along with the
6    dialogue: "Don't touch that, it's hot.  What's hot?  That's hot."  The card is entitled
7    "Paris's First Day as a Waitress."  Hallmark's "That's Hot" cards have a sales price
8    of $2.49 each and have been sold throughout the United States.  (FAC, ¶¶ 10 and
9    11)

10   **III.    THE STANDARD ON A FRCP 12(b)(6) MOTION TO DISMISS**

11         It is well established that 12(b)(6) motions are disfavored and rarely granted.
12   [U.S. v. Redwood City, 640 F.2d 963, 966 (9th Cir. 1981)]  Dismissal is appropriate
13   only when it is clear that no relief could be granted under any set of facts that could
14   be proven consistent with the allegations set forth in the complaint.  [Newman v.
15   Universal, 813 F.2d 1519, 1521-22 (9th Cir. 1987)]  The court must view all
16   allegations in the complaint in the light most favorable to the non-movant and must
17   accept all material allegations - as well as any reasonable inferences to be drawn
18   from them - as true.  [North Star Int'l v. Arizona Crop. Comm'n, 720 F.2d 578, 581
19   (9th Cir. 1983)]  Complaints and any ambiguities contained therein are construed in
20   the favor of plaintiff.  [Parks School of Business, Inc. v. Symington 51 F.3d 1480,
21   1484 (9th Cir. 1995)]  Courts must assume that all general allegations "embrace
22   whatever specific facts might be necessary to support them".  [Peloza v. Capistrano
23   Unified, 37 F.3d 517, 521 (9th Cir. 1994)]
24   / / /
25   / / /
26   / / /
27   / / /
28   / / /

**5.**

IV.   **ARGUMENT**

A.   **PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE FIRST AMENDMENT**

1.   **The First Amendment Does Not Immunize the Exploitative Use of A Person's Name and Likeness**

Although the Constitution gives the media wide latitude to engage in speech, commentary and entertainment, First Amendment immunity is not without limitations.  The media's rights must take into account a plaintiff's competing interest in protecting his/her identity from unauthorized use.  This was expressly recognized by the Supreme Court in Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562 (1977)(First Amendment did not provide defense to plaintiff's right of publicity claim).  The Ninth Circuit has also recognized the right of publicity and the right of celebrities to control the use of their identities.[ See, e.g. Midler v. Ford Motor Co., 849 F.2d 460 (9th Cir. 1988); White v. Samsung Electronics, 971 F.2d 1395 (9th Cir. 1992); Waits v. Frito-Lay, Inc., 978 F.2d 1093 (9th Cir. 1992); Abdul-Jabbar v. General Motors Corp., 85 F.3d 407, 410 (9th Cir. 1996); Downing]

In some cases, the right of publicity will take a backseat to the First Amendment, because the defendant's use of the plaintiff's name or likeness is reasonably related to a matter of public interest, or because it constitutes another form of speech that the law has determined may outweigh the right of publicity under particular circumstances.  However, when a defendant takes for itself a person's property- the right to control the use to which his identity is put -  to exploit or attract attention to itself, the First Amendment justifications disappear, and the right to publicity will prevail.  As noted by the Ninth Circuit, if the purpose of the use of a person's identity is to exploit that individual, there will be no First Amendment immunity.  [Midler at 462]  "The First Amendment is not a license to trespass, to steal, or to intrude . . ." [Dietemann v. Time, Inc., 449 F.2d 245, 249 (9th Cir. 1971); see also Lugosi v. Universal Pictures, (1979) 25 Cal. 3d 813, 851]

**6.**

The only United States Supreme Court case to rule on the interaction of the First Amendment and the right of publicity is <u>Zacchini</u> where the High Court held that even a clearly newsworthy report using a plaintiff's name and likeness in a television newscast may violate his right of publicity without implicating the First Amendment.

In <u>Zacchini</u> the issue was whether a local television station's newscast showing plaintiff's "human cannonball" act violated his right of publicity. The Supreme Court held that the station's interest in free speech did not permit it to broadcast the plaintiff's performance. <u>Zacchini</u>, 433 U.S. at 575. The television station's broadcast was completely truthful and it even praised the plaintiff's performance and urged the public to go see it. Yet, its violation of the plaintiff's right to publicity was not immunized by the First Amendment.

In <u>White v. Samsung</u> the hostess of "Wheel of Fortune" sued Samsung after it ran an advertisement of a robot, dressed in a wig, gown, and jewelry which resembled White's hair and dress. The robot was placed next to a game board instantly recognizable as the Wheel of Fortune game show set. White sued the electronic manufacturer alleging its product ads violated the California Civil Code, common-law right to publicity and privacy, and the Lanham Act. Samsung attempted to shield its conduct behind the "parody" defense, arguing that the ad's spoof of Vanna White was protected by the First Amendment. The Ninth Circuit rejected this argument, stating that "The ad's spoof of Vanna White and Wheel of Fortune is subservient and only tangentially related to the ad's primary message: 'buy Samsung VCRs.'" [<u>White</u> at 1401] The Ninth Circuit further stated that "the difference between "parody" and "knock-off" is the difference between fun and profit." [<u>Id</u>.]

Similar to <u>White</u> where Samsung, realizing that the First Amendment did not protect commercial speech, "attempt[ed] to elevate its ad above the status of

/ / /

**7.**

1  garden-variety commercial speech by pointing to the ad's parody of Vanna White,"[2]

2  Hallmark argues that its use of Plaintiff's photo is not exploitive, but rather a

3  parody.  As instructed by the Supreme Court and Ninth Circuit, the right to

4  publicity permits the use of a person's likeness only to the limited extent reasonably

5  required to convey the news to the public, or in this case, to parody that individual,

6  and it cannot be primarily related to a commercial purpose.  [Zacchini; Downing]

7  Therefore, the proper focus is whether Plaintiff's photograph served primarily as an

8  "exploitive"purpose.

9        As J. Thomas McCarthy, a leading scholar on the right to publicity, has

10  written, "the question to ask for purposes of First Amendment analysis is, 'what is

11  the *primary* purpose of this media use of human identity?'"  McCarthy, The Rights

12  of Publicity and Privacy, §8.14 at 103 (2007) (emphasis in original).

13        Given the facts of Zacchini, where the broadcast of the human cannonball

14  performance by a television station at least involved some aspect of

15  newsworthiness, Downing, where Abercrombie's Quarterly contained articles of

16  public interest, or White, which involved a parody, all of which were to some

17  degree "expressive", it is a' fortiori that Hallmark cannot avail itself of the First

18  Amendment.  At a minimum, there would be triable issues of fact as to whether

19  Hallmark's use of Plaintiff's name and likeness was essentially "exploitive," using

20  her name and likeness to "attract attention" or was essentially "informative or

21  cultural," and if it was essentially informative, whether, under these circumstances,

22  that informative purpose is outweighed by the interest of protecting an individual's

23  right of publicity.  However, an examination of the "That's Hot" card and the

24  circumstances surrounding its use would seem to resolve those issues quite clearly

25  in favor of Plaintiff.  Hallmark cannot disguise the fact that the use of Plaintiff's

26  image on its greeting cards was for the commercial purpose of selling cards

27

28        [2]White at 1401, fn.3

**8.**

1    and making money.[3]  "Unless the First Amendment bars all right to publicity

2    actions – and it does not – then it does not bar this case."  [White at 1401, fn.3.

3               **2.    _Downing v. Abercrombie & Fitch_:  The Case Hallmark**

4                       **Doesn't Want to Talk About; and Why**

5         This is not the first case in which the parties' respective attorneys have

6    squared off against one another on the issue of whether or not the First Amendment

7    barred a right of publicity action.  In Downing a group of legendary surfers

8    (represented by Hilton's counsel in this case) depicted in photograph of a surfing

9    competition held over 30 years earlier brought suit against clothing retailer

10   Abercrombie & Fitch (represented by Hallmark's counsel in this case) which had

11   used the photograph without their permission in surf-themed Quarterly catalog,

12   asserting statutory and common law commercial misappropriation claims under

13   California law, and also asserting Lanham Act claims.

14        As in this present case, in Downing Abercrombie/Hallmark's counsel argued

15   (citing much of the same case law contained in their present motion) that the First

16   Amendment immunized Abercrombie's unauthorized use of the plaintiffs' names

17   and photos in its Quarterly because it was connected to a "newsworthy" use.  This

18   argument, and the district court's grant of summary judgment, was soundly rejected

19   by the Ninth Circuit.

20        Although noting that the First Amendment defense extends "to almost all

21   reporting of recent events," as well as to publications about "people who, by their

22   accomplishments, mode of living, professional standing or calling, create a

23   legitimate and widespread attention to their activities" the Ninth Circuit ruled that

24   "the defense is not absolute", instructing that "we must find 'a proper

25

26        [3]The speaker, Hallmark, is engaged in commerce.  The audience is
     Hallmark's actual or potential customers.  The cards are economically motivated
27   because they are intended to lead to commercial transactions.  [Kasky v. Nike
     (2002) 27 Cal. 4th 939, 960-961]
28

**9.**

1   accommodation between [the] competing concerns" of freedom of speech and the

2   right of publicity.'"  [Downing at 1001]  The Downing court went on to hold that

3   because the use of the plaintiffs' photo was exploitive in nature, i.e., it was

4   primarily related to a commercial use, it was not entitled to First Amendment

5   protection.  [Downing at 1002-1003]

6        The Downing court also made a point of distinguishing Hoffman v. Capital

7   Cities/ABC Inc, 225 F.3d 1180 (9th Cir. 2001), a case on which Hallmark relies

8   heavily upon in the present motion:

9        In that case, L.A. Magazine used a digitally-altered picture of
        Hoffman, as "Tootsie," in a current designer dress to illustrate its
10       "Grand Illusions" article. We concluded that such use was
        noncommercial speech entitled to full First Amendment protection.  In
11       contrast to the present case, where Abercrombie, itself, used
        Appellants' images in its catalog to promote its clothing, L.A.
12       Magazine was unconnected to and received no consideration from the
        designer for the gown depicted in the article.  Further, while L.A.
13       Magazine merely referenced a shopping guide buried in the back of the
        magazine that provided stores and prices for the gown, Abercrombie
14       placed the Appellants' photograph on the page immediately preceding
        the "Final Heat Tees" for sale. Based on these factors, we conclude
15       that Abercrombie's use was much more commercial in nature and,
        therefore, not entitled to the full First Amendment protection accorded
16       to L.A. Magazine's use of Hoffman's image.

17   [Downing at 1003, fn. 2]

18       As in Downing, although plaintiff Hilton is a public figure and a subject of

19   public interest, Hallmark's unauthorized use of her name and photo on its greeting

20   cards is undeniably commercial in nature.  Indeed, it is even more so than the

21   unauthorized use of the surfer's photograph in Downing.  In Downing the Ninth

22   Circuit held that there was no First Amendment protection when the use of the

23   surfer's photo was found to be primarily *related* to a commercial use.  Here, the

24   unauthorized use of Plaintiff's name and likeness is *inseparable* from Hallmark's

25   commercial purpose, to sell greeting cards.  Hallmark is the Goliath of greeting

26   cards and everything it does is directed towards the singular purpose of making

27   money.  The cards with Hilton's photo on them are no exception.  As Forbes

28   Magazine stated, the Hall family has "turned fuzzy feelings into hard cash."

**10.**

Given the Ninth Circuit's ruling in <u>Downing</u>, which is controlling authority in this case,  it is understandable, if not exactly intellectually honest, why Hallmark does not even mention this case in its papers.  The fact that <u>Downing</u> is a re-affirmation of the Ninth Circuit's prior rulings also explains why Hallmark spends much of its brief citing to non-controlling cases from other Federal Circuits. Hallmark's legal gymnastics aside, both the U.S. Supreme Court and Ninth Circuit have repeatedly held that when, as in this case, the unauthorized use of an individual's identity is primarily exploitive, it is not protected by the First Amendment.

     **3.**     <u>**It is In the Exclusive Province of The Jury to Decide Whether Hallmark's Unauthorized Use of Plaintiff's Name and Likeness is Protected by the First Amendment**</u>

Stripped of its rhetoric, Hallmark's First Amendment defense boils down to one extreme proposition: that if a clever infringer can somehow cloak its unauthorized commercial use of a celebrity's name and likeness with any pretext of newsworthiness or parody, i.e., an "expressive" element, the infringer's conduct is automatically immunized.[4]  <u>Zacchini</u> itself would seem to dispose of this misconceived argument.  The fact that a defendant's use of a plaintiff's name and likeness provides some entertainment or information, as the newscast in <u>Zacchini</u> or the parody in <u>White</u> certainly did, does not mean that it necessarily acquires constitutional immunity.  Even in that situation, there is a weighing process evaluating such factors as the primary nature of defendant's work, the quantum of "information" it provides and the extent of the misappropriation of the plaintiff's

/ / /

---

[4]"As every marketer knows, the best way to sell is to slip the message "buy me" in between informing and entertaining the prospective customer." McCarthy, 8:16 at 107.

**11.**

name or likeness.[5]  Such a weighing process is within the exclusive province of the trier of fact.  [White at 1401; Newcombe v. Adolf Coors Company, 157 F.3d 686, 693 (9th Cir.1998) (whether the use of an individual's name and likeness is connected to commercial sponsorship "shall be a question of fact."); Wendt at 811]

Hallmark's "Constitutionally-mandated" automatic immunization argument is further disabused by Downing, Abdul-Jabbar at 415; Eastwood v. Superior Court, 149 CA.3d 409 (1983) and every other case which discusses the weighing process that must be utilized by the trier of fact when the right to publicity comes into conflict with the First Amendment.  California's Legislature has even defined this test:  "It shall be a question of fact whether or not the use of the person's name, ... photograph, or likeness was so directly connected with the commercial sponsorship or with the paid advertising as to constitute a use for which consent is required under subdivision (a)." (emphasis added)  [C.C. §3344(d)][6]

---

[5]As McCarthy instructs: "No one has an overriding constitutional 'right' to spray paint 'Wintergreen for President' or 'No Nukes' on the front of your house.  It is no defense whatsoever for the spray painter to argue that your house is so particularly attractive and prominently situated that it is 'necessary' to use it as a medium for the message.  Similarly, no one should have any immunizing constitutional 'right' to use your name or picture without permission as a vehicle to attract his or her social or political message, whether there is a false impression of endorsement or not."  [McCarthy].

[6]Hallmark's reliance on Cardtoons L.C. v. Major League Baseball Players Ass'n, 95 F.3d 959, 969 (10th Cir. 1996) for the proposition that a violation of an individual's right of publicity is automatically immune from liability is misguided.  In Cardtoons, which was an action for declaratory relief, the Tenth Circuit weighed the evidence - there was no automatic immunity.  Furthermore, many of the factors the court considered in ruling in favor of Cardtoons is clearly inapposite to the present case.

Unlike Cardtoons, where the court held that "Cardtoons ... is not merely hitching its wagon to a star" but rather has "added a significant creative component

1   Similar to Newcombe, just because Paris Hilton may be of public interest, it

2   does not give Hallmark the automatic right, as it suggests, to misappropriate her

3   name and Photo for a commercial purpose.  In Newcombe the Ninth Circuit

4   reversed a summary judgment, holding that the District Court improperly ignored

5   the "express command" that the connection between the defendants' use of a

6   celebrity's likeness and the commercial sponsorship is a matter of fact, that must be

7   left to the jury to decide.  [Newcombe at 694; See also, Abdul-Jabbar at 1401

8   ("While [plaintiff's] basketball record may be said to be 'newsworthy,' its use is not

9   automatically privileged."); Wendt at 811 ("the ultimate issue for the jury to decide

10  is whether the defendants are commercially exploiting the likeness of the figures to

11  Wendt and Ratzenberger intending to engender profits from their enterprises.)]

12  As demonstrated by the over three hundred pages of exhibits attached to

13  Hallmark's Motion to Dismiss, Hallmark is asking this Court to weigh the evidence.

14  However, to do so would be in contravention of the foregoing controlling authority

15  which holds that whether an unauthorized use of a person's identity is primarily

16  exploitive is a question of fact for a jury to decide.

17  / / /

18  / / /

19  / / /

20

21  of its own to the celebrity identity," [Id. at 976] in the present case there is nothing

22  transformative about Hallmark's card.  Hallmark has not created a fanciful
    caricature of Ms. Hilton and placed her in a new or unusual context.  Instead,

23  Hallmark has taken the most literal depiction of Ms. Hilton possible, her

24  photograph, along with her name, and placed her in the exact same context as a role
    she played in the television show The Simple Life.

25

26  Finally, to the extent the Tenth Circuit's opinion in Cardtoons conflicts with

27  Ninth Circuit cases such as Downing, White, Midler, Abdul-Jabar, etc., which hold
    that the determining factor is whether the primary **purpose** of the use is primarily

28  exploitative, Cardtoons must be rejected.

**13.**

1   **4.      Hallmark's "That's Hot" Greeting Card is not**
2   **"Transformative"**

3   In <u>Comedy III</u> the California Supreme Court, borrowing from Federal

4   Copyright law, developed the "transformative" test to determine whether an

5   expressive work merely appropriates a celebrity's economic value, and thus is not

6   entitled to First Amendment protection, or has been transformed into a creative

7   product that the First Amendment protects.  The transformative, <u>Comedy III</u> test

8   calls for a careful evaluation whether the use of the celebrity's image or identity is

9   of the transformative type that advances knowledge and the progress of the arts or

10  whether it merely repackages, free-riding on the celebrity's commercial value.

11      The "inquiry is whether the celebrity likeness is one of the 'raw
    materials' from which an original work is synthesized, or whether the
12  depiction or imitation of the celebrity is the very sum and substance of
    the work in question. We ask, in other words, whether a product
13  containing a celebrity's likeness is so transformed that it has become
    primarily the defendant's own expression rather than the celebrity's
14  likeness. And when we use the word 'expression,' we mean expression
    of something other than the likeness of the celebrity.... [A]n artist
15  depicting a celebrity must contribute something more than a ' 'merely
    trivial' variation, [but must create] something recognizably his own', in
16  order to qualify for legal protection. [W]hen an artist's skill and talent
    is manifestly subordinated to the overall goal of creating a
17  conventional portrait of a celebrity so as to commercially exploit his or
    her fame, then the artist's right of free expression is outweighed by the
18  right of publicity.

19  [<u>Comedy III</u> at 408]

20  In <u>Comedy III</u>  California's Supreme Court held that the right of publicity

21  prevailed over the First Amendment where an artist, who, without permission, sold

22  lithographs and t-shirts bearing a likeness of The Three Stooges reproduced from a

23  charcoal drawing the artist had made.  The court held that:

24      The artist's undeniable skill is manifestly subordinated to the overall
    goal of creating literal, conventional depictions of The Three Stooges so as to
25  exploit their fame. Indeed, were we to decide that [the artist's] depictions
    were protected by the First Amendment, we cannot perceive how the right of
26  publicity would remain a viable right other than in cases of falsified celebrity
    endorsements.  Moreover, the marketability and economic value of [the
27  artist's] work derives primarily from the fame of the celebrities depicted.
    While that fact alone does not necessarily mean the work receives no First

28  / / /

**14.**

Amendment protection, we can perceive no transformative elements in [the] works that would require such protection.

[Id. at 409; see Blakely Decl., Exh. 5]

Winter v. DC Comics (2003) 30 Cal. 4th 881 is an example of a case where the use in question was held to be transformative.  In that case, the defendant published a series of comics featuring two half-worm, half-human characters based on singers Edgar and Johnny Winter.  Both characters had long white hair and albino features similar to the Winter brothers.  The court held that the Winters were merely part of the raw material from which the comic's plot and characters were fashioned.  In addition, the characters were distorted pictures of the Winters, in stark contrast to the near literal depictions of the Three Stooges in Comedy III, the comic book characters depicted were "fanciful, creative characters, not pictures of the Winter brothers."  [Id. at 892; see Blakely Decl., Exh. 6]

As this Court can readily see, this present case is much more akin to Comedy III than Winter.  Hallmark has not added significant creative elements to create new expression and its use of Plaintiff's identity is not transformative.

The premise of the comedic television show, The Simple Life, was to depict two wealthy young socialites, Hilton and Richie, as they struggle to do manual, low-paying jobs such as cleaning rooms, doing farm work, or serving meals in restaurants; i.e., performing service jobs which are their own "private nightmare."  The Simple Life is, as intended, a spoof of Hilton's lifestyle.

Hallmark has done nothing more than take a literal depiction of Ms. Hilton, a photograph of her face, along with her name, and placed her in the exact same context as a role she played in  The Simple Life: the episode entitled Sonic Burger Shenanigans where Ms. Hilton works as a waitress serving customers.  For good measure, Hallmark has also misappropriated Plaintiff's trademarked phrase, "That's Hot", which she repeatedly used for comedic effect in the show.  Put simply, Hallmark has stolen Ms. Hilton's act for its own personal gain.

**15.**

1   As expressly noted in Comedy III, such use is not transformative and

2   therefore not protected by the First Amendment.

3   **B.   PLAINTIFF HAS ALLEGED VALID CLAIMS UNDER THE**

4   **LANHAM ACT CLAIM**

5   Under 15 U.S.C. §1125(a)(1)(A), a plaintiff who believes he will be, or has

6   been, damaged by a defendant's use of an infringing mark must show that the

7   defendant's infringing mark is likely to cause confusion or deception as to the

8   affiliation, connection, or association of such a person with another person, or as to

9   the origin, sponsorship, or approval of his services or commercial activities by

10  another person.

11  Prior to Downing, the Ninth Circuit looked to its decision in AMF, Inc. v.

12  Sleekcraft Boats, 599 F.2d 341 (9th Cir.1979) for the appropriate factors to consider

13  in determining whether there exists a likelihood of confusion.  [AMF at 348-49]

14  However, in Downing the Ninth Circuit specifically tailored these factors to

15  publicity cases involving celebrities, and restated them as follows:

16  1.   the level of recognition that the plaintiff has among the segment of the
     society for whom the defendant's product is intended;

17  2.   the relatedness of the fame or success of the plaintiff to the defendant's
     product;

18  3.   the similarity of the likeness used by the defendant to the actual
     plaintiff;

19  4.   evidence of actual confusion;

20  5.   marketing channels used;
    6.   likely degree of purchaser care;
    7.   defendant's intent on selecting the plaintiff; and

21  8.   likelihood of expansion of the product lines.

22  Furthermore, the Ninth Circuit reiterated that "the Lanham Act's likelihood of

23  confusion standard is predominantly factual in nature" and that judgment as a

24  matter of law "is inappropriate when a jury could reasonably conclude that there is a

25  likelihood of confusion."  [Downing at 1008][7]  Assuming the truth of the

26

27  ─────────────────

28  [7]Because Hallmark's use of Hilton's image was primarily commercial, she
    does not need to prove malice to establish her Lanham Act §43(a) claim.

**16.**

─────────────────────────────────────────

allegations contained in the FAC, Plaintiff has sufficiently alleged a Lanham Act claim.  (FAC, ¶¶ 21-24)

### 1.   Hallmark's use of Plaintiff's Image and Name Does Not Entitle it to A Nominative "Fair Use" Defense

Hallmark contends that the use of Plaintiff's picture in its greeting cards constitutes a nominative fair use.  In New Kids on the Block v. News America Publishing, Inc., 971 F. 2d 302, 308 (9th Cir. 1992), the Ninth Circuit set forth a three-part test to determine whether a commercial user can assert this defense:

    a) the product or service must be one not readily identifiable without use of the trademark;

    b) only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and

    c) the use must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.

[see also Downing at 1009]  In order to conduct this analysis, there must be a weighing of the evidence which is in the exclusive province of the jury.  [Abdul-Jabbar at 412]

Here, Hallmark's product is its greeting cards.  Hallmark can sell its cards without ever having to use Plaintiffs' picture or image.  Hallmark is not using Plaintiff's name and likeness in a descriptive sense, but merely as a vehicle to attract attention to its cards.

In Walt Disney Productions v. Air Pirates, 581 F.2d 751 (9th Cir. 1978) the Ninth Circuit concluded that it was not necessary, and hence not fair use, for adult comic book authors to copy Disney characters to place the characters in the minds of their readers.  In Air Pirates the defendants published two magazines of cartoons entitled "Air Pirates Funnies" where the characters bore a marked similarity to those

---

[Kournikova v. General Media Communications Inc. 278 F.Supp.2d 1111, 1128 (C.D.Cal.. 2003); In Re R.M.J., 455 U.S. 191, 203 (1982)]  Even if malice were required, this element is satisfied in ¶¶ 19 and 24 of the FAC:  "Defendant's acts were willful, malicious and oppressive to the extent that Defendant acted in conscious disregard of Plaintiff's rights."  Defendant acted with "fraudulent intent."

**17.**

of Walt-Disney.  Although the names given to the Air Pirates' characters were the same names used by Disney, the themes differed markedly from those of Disney. While Disney sought only to foster "an image of innocent delightfulness," the "Air Pirates" was "an 'underground' comic book which had placed several well-known Disney cartoon characters in incongruous settings where they engaged in activities clearly antithetical to the accepted Mickey Mouse world of scrubbed faces, bright smiles and happy endings." It centered around "a rather bawdy depiction of the Disney characters as active members of a free thinking, promiscuous, drug ingesting counterculture.

The Ninth Circuit recognized that courts analyze the substantiality of copying by a parodist by asking whether the parodist has appropriated a greater amount of the original work than is necessary to "recall or conjure up" the object of his parody.  Using this test, the court found that in evaluating how much of a taking was necessary to recall or conjure up the original, given the widespread public recognition of the Disney characters such as Mickey Mouse, very little would have been necessary to place Mickey Mouse and his image in the minds of the readers. The court also found that when the medium involved is a comic book, "a recognizable caricature is not difficult to draw, so that an alternative that involves less copying is more likely to be available than if a speech, for instance, is parodied."  [Air Pirates]

Similar to Air Pirates, Hallmark did not need to use a literal depiction of Plaintiff, her name and photo, to conjure up the object of its' purported parody. This is particularly so given the fact that Hilton has widespread public recognition and very little would be required to place her in the mind of a reader.  Hallmark  is simply commandeering Plaintiff's celebrity and her persona from the Simple Life for its own profit.  [See Triad Systems Corp. v. Southeastern Express Co., 64 F.3d 1330, 1336 (9th Cir.1995)]

/ / /

**18.**

1    Finally, the fact that a publication was commercial as opposed to nonprofit is
2    a separate factor that tends to weigh against a finding of fair use.  As the Supreme
3    Court held in <u>Harper & Row Publishers, Inc. v. Nation Enterprises</u>
4    471 U.S. 539, 562 (1985), "every commercial use of copyrighted material is
5    presumptively an unfair exploitation of the monopoly privilege that belongs to the
6    owner of the copyright."  Fair use "distinguishes between 'a true scholar and a
7    chiseler who infringes a work for personal profit."  [<u>Id</u>. at 562]  Considering these
8    factors a jury could easily conclude that Hallmark is not entitled to a fair use
9    defense.

10    **C.    PLAINTIFF IS ENTITLED TO CONDUCT DISCOVERY**
11    **AND/OR AMEND THE COMPLAINT**

12    FRCP 15(a) expressly states that leave to amend "shall be freely given when
13    justice so requires." [<u>Allen v. City of Beverly Hills</u>, 911 F.2d 367,373 (9th Cir.
14    1990)]  If this Court deems the FAC is somehow incomplete, Plaintiff should be
15    allowed to amend same and conduct discovery concerning the issues raised in
16    Defendants' motion.

17    **V.    CONCLUSION**

18    "The commercial hitchhiker seeking to travel on the fame of another will
19    have to learn to pay the fare or stand on his own two feet.  No one is free to trade on
20    another's name or appearance . . ."  [<u>Onassis v. Christian Dior</u>, 472 NYS 2d 254,
21    261 (1984)]  The fact that Paris Hilton is a well known celebrity does not give
22    / / /
23    / / /
24    / / /
25    / / /
26    / / /
27    / / /
28    / / /

**19.**

1   Hallmark a license to steal from her for its own profit.  Based upon the foregoing, it

2   is respectfully submitted that this Court deny Hallmark's Motion to Dismiss in its

3   entirety.

4       DATED:  December 3, 2007             BLAKELY LAW GROUP

5

6                                            By:  _____/s/_____

7                                            Brent H. Blakely
                                             *Attorneys for Plaintiff Paris Hilton*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**20.**

# **TABLE OF CONTENTS**

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  THE STANDARD ON A FRCP 12b(6) MOTION TO DISMISS . . . . . . . . 5

IV.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   A.  PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE FIRST
       AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      1.  The First Amendment Does Not Immunize the Exploitative
          Use of A Person's Name and Likeness . . . . . . . . . . . . . . . . . . . . 6

      2.  *Downing v. Abercrombie & Fitch*:  The Case Hallmark
          Doesn't Want to Talk About; and Why . . . . . . . . . . . . . . . . . . . 9

      3.  It is In the Exclusive Province of The Jury to Decide
          Whether Hallmark's Unauthorized Use of Plaintiff's Name
          and Likeness is Protected by the First Amendment . . . . . . . . . 11

      4.  Hallmark's "That's Hot" Greeting Card is not
          "Transformative" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

   B.  PLAINTIFF HAS ALLEGED VALID CLAIMS UNDER THE
       LANHAM ACT CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      1.  Hallmark's use of Plaintiff's Image and Name Does Not
          Entitle it to A Nominative "Fair Use" Defense . . . . . . . . . . . 17

   C.  PLAINTIFF IS ENTITLED TO CONDUCT DISCOVERY
       AND/OR AMEND THE COMPLAINT . . . . . . . . . . . . . . . . . . . . . . 19

V.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

i.

1

## **TABLE OF AUTHORITIES**

2

## **FEDERAL CASES**

3

Abdul-Jabbar v. General Motors Corp.
    85 F.3d 407, 410 (9th Cir. 1996)   . . . . . . . . . . . . . . . . . . . . . . . . 6, 12, 13, 17

4

5

AMF, Inc. v. Sleekcraft Boats
    599 F.2d 341 (9th Cir.1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

6

Cardtoons L.C. v. Major League Baseball Players Ass'n
    95 F.3d 959, 969 (10th Cir. 1996)   . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

7

8

Dietemann v. Time, Inc.
    449 F.2d 245, 249 (9th Cir. 1971)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

9

Downing v. Abercrombie & Fitch
    265 F.3d 994 (9th Cir. 2001)   . . . . . . . . . 1, 2, 6, 8, 9, 10, 11, 12, 13, 16, 17

10

11

Hoffman v. Capital Cities/ABC Inc
    225 F.3d 1180 (9th Cir. 2001)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

12

In Re R.M.J.
    455 U.S. 191, 203 (1982)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

13

14

Kournikova v. General Media Communications Inc.
    278 F.Supp.2d 1111, 1128 (C.D.Cal.. 2003)   . . . . . . . . . . . . . . . . . . . . 17

15

Midler v. Ford Motor Co.
    849 F.2d 460 (9th Cir. 1988)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 13

16

17

New Kids on the Block v. News America Publishing, Inc.
    971 F. 2d 302, 308 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

18

Newcombe v. Adolf Coors Company
    157 F.3d 686, 693 (9th Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

19

20

Newman v. Universal
    813 F.2d 1519, 1521-22 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 5

21

North Star Int'l v. Arizona Crop. Comm'n
    720 F.2d 578, 581 (9th Cir. 1983)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

22

23

Parks School of Business, Inc. v. Symington
    51 F.3d 1480, 1484 (9th Cir. 1995)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

24

Peloza v. Capistrano Unified
    37 F.3d 517, 521 (9th Cir. 1994)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

25

26

Triad Systems Corp. v. Southeastern Express Co.
    64 F.3d 1330, 1336 (9th Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

27

U.S. v. Redwood City
    640 F.2d 963, 966 (9th Cir. 1981)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28

ii.

Waits v. Frito-Lay, Inc.
    978 F.2d 1093 (9th Cir. 1992)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Walt Disney Productions v. Air Pirates
    581 F.2d 751 (9th Cir. 1978)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

White v. Samsung Electronics
    971 F.2d 1395 (9th Cir. 1992)  . . . . . . . . . . . . . . . . . . . . . 6, 7, 8, 9, 11, 12, 13

Zacchini v. Scripps-Howard Broadcasting Co.
    433 U.S. 562 (1977)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 6, 7, 8, 11

**STATE CASES**

Comedy III Productions v. Sarderup
    (2001) 25 Cal. 4th 387, 404  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 14, 15, 16

Eastwood v. Superior Court
    149 CA.3d 409 (1983)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Kasky v. Nike
    (2002) 27 Cal. 4th 939, 960-961  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Lugosi v. Universal Pictures
    (1979) 25 Cal. 3d 813, 851  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Onassis v. Christian Dior
    472 NYS 2d 254, 261 (1984)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Winter v. DC Comics
    (2003) 30 Cal. 4th 881  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**FEDERAL STATUTES**

15 U.S.C. §1125(a)(1)(A)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

iii.